13942

STATE v. ROOK *ET AL.*

(177 S. E., 143)

226

*Mr. L. G. Southard, J. Davis Kerr, Jr.,* and *S. N. Burts, Jr.,* for appellants,

*Mr. Samuel R. Watt, Solicitor,* for the State.

November 13, 1934.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

The appelants, Victor Rook, Roy Lawson, and J. H. McIntire, along with one Minnie Miller, were indicted at the October term of Court of General ·Sessions in 1933 in Spartanburg County for the murder of one Clarence Crow. The case was tried before Hon. W. H. Townsend and a jury at the October term and resulted in a verdict of guilty as against Rook, Lawson, and McIntire which automatically carried the death penalty, and guilty with recommendation to mercy as to Minnie Miller which automatically carried the penalty of life imprisonment.

The State charged that the defendants above named, on or about the 10th day of August, 1933, with force and arms, in the County of Spartanburg, inflicted upon one Clarence Crow serious, severe, and mortal blows from which he soon thereafter died in the county and State aforesaid.

Neither of the defendants had attorneys, and at the call of the case for trial Judge Townsend appointed J. Davis Kerr, Esq., and S. N. Burts, Jr., Esq., to represent the defendants. These two attorneys, acting with that earnestness and zeal which characterizes the entire bar of South Carolina, upon receiving the mandate to defend prisoners charged with capital offenses, retired to the jail and there ascertained that the defense of Rook would be antagonistic to the de-

fense of Lawson and McIntire. This matter was immediately brought to the attention of the presiding Judge, and he appointed L. G. Southard, Esq., a criminal lawyer of long experience, to represent the defendant Rook. The defendant Minnie Miller was represented by other counsel, but as there is no appeal from the verdict and judgment in her case there is no necessity to consider any matters in connection with her conviction.

At the call of the case for trial, by statement made in open Court, a motion for severance was made, which motion was participated in by the attorneys for Rook, McIntire, and Lawson. No affidavits were filed but a complete statement was made by the attorneys that the defenses were antagonistic and that the cases should be tried separately.

A résumé of the facts is necessary to determine the questions involved in the case. The defendants got together on the afternoon of August 9th and first went to Spartanburg, where certain small purchases of groceries and supplies were made. The defendants then went to Enoree, S. C., to the home of relatives of one of the defendants, where they secured some vegetables and also, unfortunately, some corn whisky. This whisky, about one quart, was drunk by the defendants and two other people whose names it is not necessary to mention. The four defendants then got in an automobile and started up the road, the car belonging to McIntire but being driven by him at times and by one of his codefendants at other times. Some one suggested that they go to the home of the Crows for the purpose of securing some blackberry wine. All acceded to this suggestion and the four made their way toward the home of the Crows.

There lived at the home of the Crows, Emanuel Crow, his wife, some children, including a ten-day-old baby, and Clarence Crow, the brother of Emanuel Crow. It appears that they were of the tenant farmer class, engaged also in making chairs, and that they were poor and humble peo-

ple who lived far removed from civilization's turmoil. The Crows were retiring, some already having gone to bed and Clarence, at the time of the approach of the defendants, had his shoes off and was about to retire for the night. The hour was near midnight and there was no soul within hearing save and except the defendants and the Crows.

Victor Rook seems to have done most of the talking on this visit and made inquiry as to whether there was any blackberry wine in the house. There were some curse words used, and finally the defendants were told that there was no blackberry wine in the house. This did not seem to satisfy them, and Mrs. Crow stated that they could go look in the churn where the blackberries rotted before she could make them into wine. Rook stated that Tom Hendricks said that the Crows had some wine and there was testimony that he threatened to get a shotgun and beat the ears off of Emanuel Crow. Clarence Crow stated "that either you or Tom Hendricks, one told a damn lie." There seems to have been no blood shed at the first encounter and the episode was confined solely to some disturbance and cursing. The defendants went off in the car and came back in about an hour and a half and again drove up in the yard of the Crows, and it was on this return visit that the fatal encounter occurred. Victor Rook called Clarence Crow out, who had made the statement about the damn lie, stating that he wished to apologize. Reluctantly Clarence Crow came out and, according to the undisputed testimony of all, merely laid his hand upon Rook, and Rook then becoming enraged, struck Crow in the face, Rook says with his hand, but other witnesses say with a rock. Crow fell to the ground, and Roy Lawson jumped upon him, stomped and beat him, and during the entire time Minnie Miller was standing by holding or fighting Mrs. Crow. McIntire was present, also, and, after Clarence Crow was down, sought to find Emanuel Crow. Clarence Crow lingered and died the next afternoon, the entire back of his head being crushed and mashed either by being

beaten against a rock in the ground or by being beaten by some hard instrument in the hands of one of the defendants. There were numbers of minor bruised places on other parts of his body, also.

The defendants left, and on the next day McIntire stated to one Dellinger that he had beat up four or five of the Crows and guessed that some of them had died. This same McIntire had already, a few days prior to the killing, told Rev. Duggans, a minister of the Church of God, that Emanuel Crow should be attended to for living with his own daughter. All of the defendants then began to scatter about. Minnie Miller went to Clinton; Victor Rook went to Kentucky but returned and surrendered; McIntire told Dellinger that he was going to leave, making arrangements about some money; and Lawson went back to his home at Pacolet. The defendants took the stand and testified the one against the other, and their testimony was to the effect that at the suggestion of certain ones they went to the Crows the second time for the purpose of having trouble and beating the Crows up. In other words, there was testimony that they went to the home of the Crows in the middle of the night for the purpose of raising a disturbance and beating them up, at least.

The power of the law to take the life of human beings for a violation of the law is one which should be and is exercised with extreme caution. The frailities of human nature are so manifold and manifest until the law should and does throw around the defendant every safeguard to enable such defendant to secure a fair and impartial trial and to be protected throughout the case. In a capital case counsel is furnished to the defendant without cost and every presumption and legal safeguard is thrown about the defendant that he should obtain a fair and impartial trial.

This Court has taken the position that in all cases involving the life of the defendant it is not bound down to a consideration of the exceptions raised, but

if anything appears in the record which would warrant a reversal of the cause the Court will consider that matter as if raised by the exceptions.

In this case, however, the Court appointed attorneys for the appellants, have safeguarded their rights at every stage of the cases, and the exceptions raise every possible point that should be considered in the matter.

We will take the exceptions up in order and dispose of the same.

Exception 1 complains of the refusal of the trial Judge to grant a severance in this case. Counsel for appellants admit perfectly frankly that this is a matter largely within the discretion of the Court, but contend earnestly that in this case, the defenses being so antagonistic, a severance should have been granted. In a matter of conspiracy it is logical to say that in the majority of cases the defendants should be tried together because the act of one is the act of all if the conspiracy is proven but even in a conspiracy case there might be a time when the granting of a severance would be necessary. Of course, in any case if it appears to the Court that the trial Judge has abused his discretion this Court has a right to reverse his order and grant such severance. We can see no good reason in his case to deviate from the rule laid down in the case of *State v. Jeffords,* 121 S. C., 443, 114 S. E., 415, where a severance was refused and the ruling of the trial Judge was approved by the Supreme Court. This exception is, therefore, overruled.

The second exception complains that the trial Judge should have granted a directed verdict as to the defendant McIntire, on the theory that only testimony in the cause connecting McIntire with the fatal encounter was the confession of Rook, which admittedly could not be used as testimony against the defendant, McIntire. Were this all of the testimony against McIntire, the position of the appellant McIntire would be imminently correct, but there are two places in the record which connect McIntire with

the fatal encounter aside from the confession of Rook. The witness Duggans, a minister, testified that a few days before the fatal encounter McIntire made certain statements to him about the Crows and indicated his animosity toward the Crows. The witness Dellinger testified that after the alleged fatal encounter on the day following, McIntire told him that he had been in trouble with the Crows, had beat up four or five of them, and guessed that some of them would die. Under this evidence the Circuit Judge was not warranted in directing a verdict in favor of McIntire. It is true that in making the ruling in the absence of the jury the Circuit Judge did remark that they went down to the home of the Crows for the purpose of beating them up, and this statement was contained in the confession of Rook; but the solicitor called the attention of the Circuit Judge to the statement of Duggans and the statement of Dellinger and the Circuit Judge properly submitted the issue to the jury.

Exception 3 alleges error on the part of the Circuit Judge in admitting the confession of Rook and allowing the same to be read to the jury. The basis of this exception is that the instruction of the trial Judge to disregard the confession of Rook as to his codefendants could not eliminate from the minds of the jury the statements contained in that confession. Had the Judge failed to give the jury such instruction it would have been reversible error, and as the confession was properly allowed in evidence, the construction of the trial Judge was imminently correct as to its force and effect. Later, Rook took the stand and reiterated every statement made in the confession, and when Rook took the stand and produced a pardon from the Governor restoring his citizenship, his testimony became competent against his codefendants. This principle is well recognized in our law and is amply sustained by the authorities of this Court. State v. Sowell, 85 S. C., 278, 67 S. E., 316; State v. Griffin, 98 S. C., 105, 82 S. E., 254, Ann. Cas., 1916-D, 392; State v. Johnson, 119 S. C., 55, 110 S. E., 460.

Exception 4 complains that the trial Judge erred in allowing the solicitor to examine the defendant Lawson in regard to the contents of a letter alleged to have been written by the defendant Lawson, in which he made certain statements about consultation with his attorneys and the certain opinions which had been expressed with reference to his case.

The appellants take the position that this letter allowed and permitted a confidential communication between attorney and client to be exposed by the solicitor. The rule with reference to attorney and client is made for the protection of the client and if the client sees fit to expose the matters which are discussed between himself and his attorney that is the affair of the client. The attorney cannot speak, for the information which he has is given to him in confidence by the client, but the client can speak if he so desires and the privilege is with him to speak or not to speak as he deems advisable. If the rule were otherwise, any person charged with crime could refuse to answer questions upon the stand on the basis that he had conferred with his attorney about the matter. There is no merit in this exception and it is overruled.

Exception 5 complains of error in the Circuit Judge remarking while Emanuel Crow was being examined by Mr. Kerr: "Suppose you let Mr. Lanham see if he can get him to talk." As before stated, Crow was a very ignorant and unlearned person. He was not accustomed to Court procedure, and counsel for the appellants had considerable difficulty in getting him to answer questions in the cause. The Judge assisted as much as possible and this remark was made in an effort to get Crow to answer the questions of defendants' attorneys. Great latitude was given to the attorneys for the defendants in the cross-examination and there could be no just cause of complaint that the cross-examination was limited. This exception is, therefore, overruled.

Exception 6 complains of error in the trial Judge asking the witness Emanuel Crow this question: "Had they got through with your brother before they started on you?"

Crow had just made a statement with reference to the time when he was struck and there was considerable confusion about when this lick occurred, and Judge Townsend, in the attempt to straighten the matter out, asked this question. It was within his province, and we can see no error in this question.

Exception 7 complains of the same language and alleges that the Judge, by his remark, expressed an opinion as to the conspiracy and, therefore, that it was reversible error. The disposition of Exception 6 also disposes of the question raised in Exception 7.

Exception 8 complains of error that the trial Judge erred in saying to the witness Crow while upon the stand: "Just tell the jury what you saw Rook do. Talk out. You need not be afraid now; nobody is going to hurt you."

As before intimated, Crow had shown much confusion upon the stand. He would not answer questions promptly and in many cases made no response whatsoever to the questions. Mr. Southard, counsel for the defendant Rook, on one occasion told the witness Crow that he was not going to hurt him and from the entire record it shows that Crow was terrified. The Court had a right to elicit the whole truth from Crow, and in doing so the trial Judge had a right to assure Crow that there would no harm come to him from his testimony. It probably would have been better had the trial Judge not made this remark, but we cannot see where it constitutes reversible error.

Exception 9 complains of error in the illustration of the stoning of Stephen used by the trial Judge in charging on the question of conspiracy.

The use of biblical illustrations in Courts of justice has long been the practice of our Christian country, for the Bible

contains the rules of conduct which govern us in our daily
lives. There is hardly a matter which arises that the Good
Book does not give some light upon.

Of course, in telling the story of the stoning of Stephen,
St. Luke, the physician who wrote the Acts and who, by the
way, was not one of the Twelve Apostles, makes it very
plain that Stephen was legally executed according to the law
of the Jews. It is true his execution was consummated by
false testimony, and it is true that his execution was unwar-
ranted; but the particular thing which St. Luke brings out
is that a man named Saul was standing by consenting to the
execution and that the clothes of the witnesses who, under
the Jewish law, carried out the sentence, were laid at Saul's
feet. After Saul had seen the light and had changed from
Christianity's most violent enemy to its most militant de-
fender and had assumed the name of Paul, he (Paul), for-
ever blamed himself that he did stand by and consented to
the stoning of Stephen. The illustration, however, was prob-
ably not entirely appropriate, but there was no error of law
in using it. If the conspiracy had been formed to beat up
the Crows and McIntire went to the place and stood by
knowing of the conspiracy and being a party to it and did
nothing to prevent the carrying of the conspiracy into effect,
this fact alone might be sufficient for the jury to convict him
upon. It is always a question for the jury to determine by
the facts and circumstances in the case if a person has re-
tired from the unlawful and illegal conspiracy, and the
charge of the trial Judge was very clear upon this issue. He
gave the defendants the benefit of this charge and the jury
found the defendants guilty. There is no error in this ex-
ception.

Exception 10 complains of error in the trial Judge
calling the name of Crow instead of designating the
dead man by the name of the deceased.

This Court has said that where there is a family relation it
is improper to comment upon that fact to the jury, and in

the case of *State v. Ferguson,* 91 S. C., 235, 74 S. E., 502, where a son was indicted for killing his father, the Court held that the trial Judge should not have referred to the accused and the deceased as father and son, but there is no decision which prevents the Court from calling the name of the deceased or the name of the defendant. In this case the attack was not particularly against Clarence Crow, the deceased, but the record discloses that it was the purpose and intention of the defendants to beat up the Crows, and from the record it would appear that Emanuel Crow was as much the object of the defendants' ill will as Clarence Crow. There was no error in the reference by the trial Judge in his charge.

As before stated, we have examined and considered the record in its entirety. We have examined the charge of the trial Judge. It stated the correct principles of law and gave to the defendants the benefit of every safeguard which was placed around them by the law.

In the darkness of the night, far removed from the centers of strife and bustle, an humble family occupied a lowly dwelling house. They were at peace with the world and about to rest from their labors when there descended upon them the defendants, filled with whisky and filled with malice. They were aroused from their peachful bed and precipitated into a difficulty which caused the death of one of their number. They were entitled to sleep, unmolested in their home, but this right was taken from them. The defendants came at a midnight hour and raised a disturbance and, not satisfied, came back to raise still another disturbance, and in this last disturbance Clarence Crow lost his life. The jury, drawn from their vicinity, has said that they were guilty and that they should suffer the extreme penalty of the law. There is ample evidence to sustain this finding. The jury could have granted mercy to the defendants as it did to Minnie Miller, but this the jury did not do. It is not the province of this Court to grant mercy to the defendants but to inquire whether there is any reversible error in the cause. There is no reversible error.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.

MESSRS. JUSTICES STABLER and BONHAM and MR. ACTING ASSOCIATE JUSTICE C. T. GRAYDON concur.